FILED
 2011 Jun-22 PM 02:30
U.S. DISTRICT COURT
    N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| SAMANTHA J. MOORE, | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 10-G-1483-NE |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

The plaintiff, Samantha J. Moore, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Benefits.  Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations

omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether she has a severe impairment;

    (3)    whether her impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform her past work; and

>   (5)   whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the instant case, the ALJ, Patrick R. Digby, determined the plaintiff met the first two tests, but concluded  did not suffer from a listed impairment.  The ALJ found the plaintiff unable to perform her past relevant work.  Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, at 1559.  When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids).  Foote, at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids.  Foote, at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony.  Foote, at 1559.

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers within the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony or the

testimony of his doctors is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit that testimony is found not to be supported by substantial evidence.

In Varney v. Secretary of Health and Human Services, 859 F.2d 1396 (9th Cir. 1987), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. Id at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." Id. If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As Varney recognized, if the VE testifies the claimant can perform no jobs if his pain testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited. Id. This also holds true for the opinions of treating physicians.

### THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

As the Sixth Circuit has noted: "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary."

McGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).  In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight ...."  McGregor, 786 F.2d at 1053.  If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true.  McGregor, 786 F.2d at 1053; Elam, 921 F.2d at 1216.  The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence.  See McGregor, 786 F.2d at 1054; cf. Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## DISCUSSION

The plaintiff was 26 years old at the time of ALJ Patrick L. Digby's decision.  The ALJ found the following severe combination of impairments: bipolar disorder; attention deficit hyperactivity disorder (ADHD) as a child by history; anxiety; status post fracture of the right foot; and obesity. [R. 15]. However, he found that she did not have an impairment or combination of impairments that meets the listings. [R. 16]. The plaintiff is a high school graduate who took one or two college courses on-line.  Her past work includes photographer and customer service representative at a satellite television call center.  She testified that she left the photographer job because she "couldn't handle all the pressure of being around so many people day in and day out and

[her new job] was also for more pay." [R. 41]. She testified that she was let go from the call center job because "I started blacking out and I had to miss too many days." [R. 41]. She alleges disability beginning July 10, 2006.

The ALJ stated that the plaintiff's "earning's record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2007." [R. 13]. Apparently, the ALJ relied on a Disability Determination and Transmittal of November 16, 2006. [R. 69].However, the plaintiff correctly points out that the plaintiff's earnings record actually shows that her date last insured for disability insurance benefits is March 31, 2010. [R. 94].

The first medical record available was a psychiatric evaluation dated August 4, 1999, by Albert L. Sprinkle, III, M.D., a psychiatrist. At that time the plaintiff was 17 ½ years old and she had run away from home. [R. 163]. At this evaluation, Dr. Sprinkle diagnosed: (1) major depression, recurrent, moderate; (2) parent child relational problems; (3) borderline personality traits; (4) obesity; (5) family conflict; and (6) a GAF of 70. [R. 165]. Dr. Sprinkle didn't think she met hospitalization criteria, but did change her medicine from Wellbutrin to Effexor. Id.

She received no further mental health treatment until April 24, 2006, when she was seen by Ammar Alrefai, M.D., when her chief complaint was "depression stuff." [R. 206]. Dr. Alrefai diagnosed Bipolar II Disorder, and assigned a GAF of 55. Id. On July 14, 2006, she was seen at Crestwood Medical Center for an "Integrated Clinical

Assessment." She sought treatment at that time because "basically I have had a really bad patch lately." [R. 233]. Dr. Alrefai thought she should start a partial hospital program because of depression following her delivery of a stillborn child. Id. She had a suicidal gesture: "She attempted to cut her wrist with a butter knife about a month ago, and barely broke the skin." [R. 233-34]. Her substance use/abuse history was:

> She says she may drink alcohol a few times a month, more on a social basis. Her last use of alcohol was last night, and she had 3 ½ beers. She stated she drank more than usual, because her brother was with her. She began using cigarettes at the age 8 with regular use beginning at the age of 18. At most she smokes two packs per day when really anxious. Generally, she smokes ½ to 1 pack per day. She has not had any cigarettes on the day of this screening. She drinks 1 to 2 Dr. Peppers, but not on a daily basis. She has tried marijuana three times, and the last use was in March 2006. She denies a history of other substance use, abuse history.

[R. 235]. The results of the mental status examination were as follows:

> The patient is well groomed and appears her stated age. She was overweight. Her level of consciousness is alert. She is oriented x3. Eye contact is good. Speech was within normal limits. Mood was described as being, "pretty decent". She says she has been generally happy today, but has had some periods of crying today. Her affect is labile. Word usage is good. Stream of thought was slowed and content of thought was normal. There was no report of obsessions or compulsions. She has episodes of dejavu. [sic] When alone at home at night she hears noises, but nothing lately. She has been staying at her mother's house. She denies the presence of other perceptual problems. Her attention, concentration and memory are impaired. She says she misplaces things and forgets doing some of the tasks that she needs to do during the day. Intelligence is estimated to be within the average range. Her degree of judgment and insight are moderately impaired. She states, "I just want to be able to do something normally".

Id. The diagnostic impression was Bipolar disorder, current episode depressed, and the GAF was assessed at 45 to 50.[1] [R. 235-36]. She was admitted for a two-week outpatient program. [R. 284-366]. Therapy notes state that during this program, "She has been going and singing karaoke at nights and her mother is concerned that she is going to [sic – obviously, the counselor meant "too"] often. Samantha reported that she didn't think this was a problem because it is such a good release for her at this time." [R. 305].

---

[1] The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 30 (4th Edition) ("DSM-IV"). A GAF of 41-50 indicates: "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32. Several courts of appeal have, in unpublished or nonprecedential opinions, considered the impact of a claimant's GAF score of 50 or below. The courts generally find that a GAF score of 50 or below is not in and off itself determinative of disability. See Hillman v.Barnhart, 48 Fed Appx. 26, 2002 WL 31260962 at * 3, n.1(3rd Cir. 2002)(not precedential)(noting that a GAF of 50 would indicate a claimant could perform some substantial gainful activity); Rutter v. Comm'r of Soc. Sec., 91 F.3d 144 (Table), 1996 WL 397424 at *2 (6th Cir. 1996)(unpublished opinion)(exclusive reliance on GAF score not appropriate); Roemmick v. Shalala, 59 F.3d 176 (Table), 1995 WL 299894 at *2, n.1 (9th Cir. 1995)(noting that an inability to work is only one example of the level of adaptation meriting a GAF of 40); Seymore v. Apfel, 131 F.3d 152 (Table), 1997 WL 7555386 at *2 (10th Cir. 1997)("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work."); Stalvey v. Apfel, 242 F.3d 390 (Table), 2001 WL 50747 at *2 (10th Cir. 1999)("The GAF is not an absolute determiner of ability to work."). But cf. Lloyd v. Barnhart, 47 Fed. Appx. 135, 2002 WL 31111988 at *1, n.2 (3rd Cir. 2002)(not precedential)(noting that a vocational expert at the administrative hearing testified that a GAF of 50 or lower would indicate claimant would not be able to keep a job).

On August 1, 2006, a psychiatric progress note from Dr. Alrefai noted moderate symptoms of anxiety, depression and sleep disturbance. [R. 374]. Diagnosis was bipolar disorder nos (moderate), with symptoms six out of 10, side effects one out of 10, and overall functioning four out of 10. Id. However, orientation, general intellectual functioning, eye contact, dress, thought contact, speech, thought process, behavior and general attitude, attention, memory, reliability and motor activity were all normal. [R. 375]. Her mood was described as dysphoric and anxious. Id. She was last seen by Dr. Alrefai on October 11, 2006, where he found mild anxiety. [R. 383]. Symptoms were down to two out of 10, side effects zero out of 10, and overall functioning six out of 10. Id.

On October 31, 2006, she was seen by Lois W. Petrella, Psy.D. (a clinical psychologist) for a consultative psychological evaluation at the request of the Commissioner. Diagnosis was Anxiety Disorder NOS (Mixed Anxiety-Depressive Disorder), Bipolar Disorder by previous diagnosis, Personality Disorder NOS with Dependent and Borderline Features. [R. 253]. Her current GAF was 60, and Dr. Petrella found the plaintiff would be able to manage benefits if awarded: "She would be able to function totally independently if she had the financial resources to do so." Id. She also found that the plaintiff "would be able to understand, carry out, and remember instructions in a work setting, but only on the days when she is not having panic attacks." Id.(emphasis added) "She would not have any difficulty responding appropriately to

supervisors, coworkers, and work pressures in a work setting <u>when she is not having panic attacks</u>." <u>Id.</u>(emphasis added)  The ALJ gave "some weight" to Dr. Petrella's opinion, although he said "the majority of evidence shows no significant symptoms/limitations [of panic attacks] on a consistent basis." [R. 19].  However, the court notes that Dr. Petrella's opinion is consistent with the opinions of Patricia Mayfield, MSW, the plaintiff's therapist[2], and that of Dr. Alrefai.[3]

On January 3, 2007, Dr. Alrefai completed a Mental Residual Functional Capacity Questionnaire.  He said the plaintiff was "first seen in my office 8-1-06 and last seen 10-11-06." [R. 450].  His diagnosis was:

    Axis I:       Bipolar disorder

    Axis II:      None

    Axis III:     obesity

    Axis IV:     primary support issues

    Axis V:      Current GAF 40; Highest GAF past year: 50

<u>Id.</u>  Dr. Alrefai described the plaintiff's treatment:

---

[2] On October 5, 2007, Ms. Mayfield noted that the plaintiff "[e]xperiences increased panic attacks and depression." [R. 444].  She also stated that the plaintiff's "[m]ood swings and anxiety attacks are unpredictable." [R. 446].

[3] As noted below, Dr. Alrefai found the plaintiff to have persistent disturbances of mood or affect, emotional withdrawal or isolation, and unstable, rapidly changing emotions. [R. 451].

>Pt was admitted to partial hospital program at Crestwood and then cont as an outpatient. She had moderate improvement with medication and supportive therapy.

Id. She takes lamictal as a mood stabilizer and has a rash as a side effect. Id. Dr. Alrefai listed the plaintiff's symptoms:

- Decreased energy;

- Thoughts of suicide;

- Blunt, flat or inappropriate affect;

- Feelings of guilt or worthlessness;

- Impairment in impulse control;

- Mood disturbance;

- Difficulty thinking or concentrating;

- Persistent disturbances of mood or affect;

- Emotional withdrawal or isolation;

- Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

- Emotional lability[4]; and

- Sleep disturbance.

---

[4] "In psychiatry, emotional instability; rapidly changing emotions." Dorland's Illustrated Medical Dictionary 891 (28th Ed. 1994).

[R. 451]. In Dr. Alrefai's report he finds that the plaintiff is "Seriously limited, but not precluded" in 15 of 25 categories, and "Unable to meet competitive standards" in three[5] of 25 categories. [R. 452-53]. He thought that the plaintiff's impairments would cause her to be absent from work more than four days a month. Dr. Alrefai answered "no" to the question of whether the plaintiff is a malingerer. [R. 454].

The ALJ found, and the Commissioner argues, that the treating psychiatrist Alrefai's opinion is inconsistent with his treatment records. [R. 19]:

> The claimant's allegations of disabling symptoms and limitations due to anxiety with panic attacks and depression are also not supported by the medical evidence of record. There is no documented evidence of any blackout spells. It is noted that prior to her alleged onset date, she was treated for major depression, recurrent, moderate, and borderline personality traits for a 3-month period in 1999 after she ran away from home. The record shows no further treatment until April 2006 at the Alabama Psychiatric Services when she was diagnosed with bipolar disorder. However, he opined only moderate symptoms (GAF of 55) even though she had not been treated in 6 to 7 years and was not taking any medication. Thereafter, she reported an increase in symptoms, and in July 2006, Dr. Alrefai assessed a GAF of 45 to 50 (indicating serious symptoms (DSM-IV) and recommended a partial hospital program and the records show she was admitted to that outpatient program for about a 2-week period. During that period, her mother complained that she was going out most nights performing karaoke. The records show that upon [being] released she had learned effective coping skills and had improved communications regarding admission problems. Improvement is confirmed by September 14, 2006 office notes of Dr. Alrefai indicating she was orientated [sic] to person, place, and time, mood was appropriate, normal affect, good memory, normal thought content, clear though[t] process, normal attention span, and

---

[5] These are: respond appropriately to changes in a routine work setting; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. [R. 452-53].

good judgment and insight.  The records show she was last seen by Dr. Alrefai on October 11, 2006, when he noted that she had no more than "mild" anxiety/panic/phobias. . . .

\*      \*      \*

On January 3, 2007, Dr. Alrefai completed a mental residual functional capacity questionnaire in which he opined the claimant made moderate improvement with medication and supportive therapy, but opined the claimant's ability was seriously limited in most areas referencing his clinical findings and mental status results as supporting evidence. However, Dr. Alrefai's records contrast sharply with his opinion on the mental status form.  As discussed above, except during July 2006, his treatment records show no more than moderate symptoms/limitations and when he last saw her in October 2006, he noted no more than "mild" anxiety/panic/phobias . . . .

[R. 18-20].   One important aspect of the Commissioners' duty to develop a fair and complete record is his duty to recontact a claimant's treating physician.  The Commissioner's regulations provide as follows:

> (e) Recontacting medical sources.  When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions.
>
>> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available.  We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.  We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.  In every instance

> where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e). If the ALJ had doubts about the treating psychiatrist's opinion, he should have recontacted him to explain any ambiguities. Instead, the ALJ "succumbed to the [forbidden] temptation to play doctor and make [his] own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). Because the ALJ failed to follow the Commissioner's own regulations, his rejection of the opinion of the plaintiff's treating psychiatrist is not supported by substantial evidence. Therefore, Dr. Alrefai's opinion must be accepted as true.

At the plaintiff's ALJ hearing, John McKiney, a vocational expert, was questioned about the impact of the opinions of Ms. Mayfield and Dr. Alrefai, who thought that the plaintiff would be absent from work at least four days a month because of her impairments. The VE testified:

> If the person was having to be absent from work at least four days a months an likely more the way that's written, you know, you're talking about missing close to – at least 50 days of work a year and there's no way a person could maintain employment being absent that frequently.

[R. 64].

When considering whether substantial evidence supports an ALJ's decision, the evidence as a whole must be considered. Proper application of the substantial evidence standard requires an evaluation of all of the evidence in the record.

> Substantiality of the evidence must be based upon the record taken as a whole, Futernick v. Richardson, 484 F.2d 647 (6th Cir. 1973) . . . . The

15

court "may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence." Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978).

Sias v. Secretary of Health and Human Services, 861 F.2d 475, 479 n. 1, (6th Cir. 1988).

The evidence must do more than create a suspicion of the existence of the fact to be established.... [i]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." National Labor Relations Board v. Columbian Enameling & Stamping Co., Inc., 306 U.S. 292, 300, 59 S. Ct. 501, 505, 83 L. Ed. 660 (1939).

Id. Instead of relying on the opinion of the plaintiff's treating psychiatrist, the ALJ chose to accord substantial weight to the opinions of the State agency medical consultants who did not examine the plaintiff. [R. 21]. As stated above, although the ALJ recited reasons for rejecting Dr. Alrefai's medical source opinion, those reasons are not supported by substantial evidence. Therefore, based upon the law of this circuit, Dr. Alrefai's medical source opinion must be accepted as true and the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 22 June 2011.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.